# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 22-260V

|  |  |
|---|---|
| MERRIE MORRIS-MAZZETTI, administrator of ESTATE OF STANLEY HATCH, <br><br> Petitioner, <br><br> v. <br><br> SECRETARY OF HEALTH AND HUMAN SERVICES, <br><br> Respondent. | Chief Special Master Corcoran <br><br> Filed: April 22, 2026 |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for Petitioner.*

*Emilie Williams, U.S. Department of Justice, Washington, DC, for Respondent.*

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

On March 8, 2022, Stanley Hatch filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner[3] alleged that following Mr. Hatch's receipt of an influenza ("flu") vaccine on October 8, 2019, he developed Guillain-Barré syndrome ("GBS"). ECF No. 1 at ¶¶ 1-3 ("Petition"). The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at   https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Stanley Hatch died on September 27, 2023, during the pendency of this case. Ex. 26 at 2. On March 27, 2026, I granted the motion to amend the caption to name Ms. Morris-Mazzetti, administrator of the Estate of Stanley Hatch, as Petitioner. ECF No. 46.

Because Petitioner cannot establish Table-consistent onset, Mr. Hatch's estate is not entitled to compensation – and must also make an evidentiary and legal showing as to why the claim in its entirety is not properly dismissed, given the lengthy post-vaccination onset established by the medical record in this case.

## I.      Procedural History

On August 10, 2022, this case was assigned to the SPU. ECF No. 21. On April 21, 2023, Respondent filed a Rule 4(c) Report asserting that this case was not appropriate for compensation. ECF No. 29 at 1 ("Rule 4(c) Report"). In particular, Respondent argued that the onset of Mr. Hatch's condition precluded him from establishing a presumptive GBS Table injury because he did not suffer the first symptom or manifestation of onset of GBS until nine weeks and one day after vaccination, or 64 days post-vaccination. *Id.* at 6.

On May 22, 2023, I ordered the parties to brief the issue of onset. EFC No. 30. Mr. Hatch filed a brief setting forth his position on August 14, 2023. ECF No. 33 ("Br."). On October 12, 2023, Respondent filed a response brief. ECF No. 35 ("Opp."). Petitioner did not file a reply. Resolution of this matter was delayed during the process of opening Mr. Hatch's estate and for the appointment of an administrator, but it is now ripe for adjudication.

## II.      Relevant Evidence

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments.

### A.      Pre-Vaccination Medical Condition

Mr. Hatch was 85 years old and retired at the time of vaccination. *See, e.g.*, Ex. 4 at 74; Ex. 11 at 41. His medical history was significant for chronic obstructive pulmonary disease ("COPD"), male breast cancer, hypertension, Bell's palsy, and a longstanding essential tremor in his upper extremities. Ex. 2 at 121; Ex. 3 at 8; Ex. 5 at 25. Despite these concerns, Mr. Hatch was quite physically active – he was an "expert skier," had practiced yoga since the 1980s and trained three times per week, played basketball twice a week, and rode his bicycle regularly before he suffered an accident and broke his wrist in 2014. Ex. 11 at 290; Ex. 24 at 1-2. Mr. Hatch was also the primary caretaker for his

wife, who had Alzheimer's disease, but the couple still enjoyed an active social life. Ex. 4 at 74; Ex. 24 at 2.

### B. Receipt of the Flu Vaccine and Inpatient Treatment for GBS in December 2019

Mr. Hatch received the flu vaccine on October 8, 2019. At that time, he considered himself to be in the "best physical shape [that] [he] had been in for many years." Ex. 24 at 1. His next medical encounter was on October 17, 2019, when his pulmonologist, Dr. Jeffrey Kupperman, referred him to an imaging center for a chest x-ray.[4] Ex. 17 at 15. On the radiology forms, Mr. Hatch wrote that his symptoms were cough and chest discomfort for the past week. *See id.* at 15-18. The x-rays revealed no evidence of acute cardiopulmonary disease. *Id.* at 18.

On October 18, 2019, Mr. Hatch again saw Dr. Kupperman for a "[s]ick visit with [chest x-ray]." Ex. 2 at 107. Dr. Kupperman wrote that,

> Stan has been doing well with mild exertional dyspnea until the last week he developed cough with chest congestion. There is no other history of recent malaise, fatigue, fever, chills, night sweats, weight loss, PND, PNA, orthopnea, pedal edema, palpitations, chest pains, worsening dyspnea, sputum production, or hemoptysis. There is no recent history of worsening nasal congestion or coryza, heartburn, pyrosis, dysphagia, or hoarseness. Patient denies fall risk.

*Id.* at 109. Further, in the review of systems, Mr. Hatch did not describe any new musculoskeletal symptoms or any "new difficulties with speech, stroke, paresis, numbness, syncope, seizures, or gait disturbance." *Id.* Dr. Kupperman instructed Mr. Hatch to continue his usual medications for COPD/asthmatic bronchitis.[5] *Id.* 110.

Mr. Hatch did not have any further appointments after receiving the flu vaccine that October until just under two months later, when he drove himself to the emergency department of Santa Barara Cottage Health Hospital in the early morning of December 12, 2019. Ex. 4 at 39; Ex. 20 at 166. He now complained of "full body tingling numbness" that "started at 19:00" the previous day. Ex. 20 at 166, 175. Mr. Hatch stated that he was practicing yoga earlier in the day, "prior to the onset of numbness," and felt "more off

---

[4] Petitioner did not file any records of a communication with Dr. Kupperman that precipitated the chest x-ray.

[5] Dr. Kupperman also prescribed Mr. Hatch azithromycin and primidone (the latter presumably for his essential tremor). Ex. 2 at 111-12.

balance than normal." *Id.* at 166, 174. *Id.* He fell into a lamp later that day due to leg weakness. *Id.* at 197. The "tingling numbness in his full body began while lying in bed." *Id.* at 166. Mr. Hatch called Dr. Kupperman "after the onset of his symptoms," and was advised to go to the hospital. *Id.*

On examination, Mr. Hatch revealed decreased sensation in his bilateral lower extremities, significantly worse on the left side. *Id.* at 174. He also had trouble feeling his genitals or the urge to use the bathroom. *Id.* Mr. Hatch underwent scans of his head, brain, and spine. The imaging revealed two incidental brain aneurysms and an unknown lesion on his spine, but did not assist in finding the underlying cause of his symptoms.[6] Ex. 4 at 47, 51. He was admitted for further evaluation. Ex. 20 at 175.

Later in the morning on December 12, 2019, Mr. Hatch was seen by neurologist Dr. Philip Delio. *Id.* at 227. To Dr. Delio, Mr. Hatch provided more detail about the onset of his symptoms. Dr. Delio wrote,

> He says yesterday when he tried to do a routine Yoga session in the morning with a trainer, his legs felt weak and he was unstable doing some of the exercises. He was able to complete them however. At the end of his session, he was leaning on an exercise bar on the wall, and his lost his footing and fell. He slumped to the ground, he denies head or neck trauma. He did scrape his left arm against the bar as he went down, but that was his only real reported injury. He later went to lunch but as the day progressed he became increasingly aware of the paresthesias in his B UE and his LE in the feet and shins. This was coupled with increased trouble with his ambulation and gait. He drove himself to the ER last night as he was having progressively more difficulty with his gait and balance. He was admitted overnight with no change in his condition but finds it hard to walk due to leg weakness and has continued leg paresthesias.

*Id.* Dr. Delio suspected that Mr. Hatch had GBS and ordered a lumbar puncture.[7] *Id.* at 243. The lumbar puncture indicated elevated cerebral spinal fluid ("CSF") protein levels of 55 mg/dL, with a reference range of 15-45 mg/dL. *Id.* at 502. Dr. Delio then started Mr. Hatch on intravenous immunoglobulin ("IVIG") treatment. *Id.* at 313.

---

[6] Due to Mr. Hatch's history of male breast cancer, there was concern that this lesion could represent a metastasis of the disease. *Id.* at 242-43.

[7] On December 17, 2019, Dr. Delio noted that Mr. Hatch's sensory symptoms were unusual for GBS and suggested that he could have "some variant or acute systemic neuropathy." Ex. 4 at 85. However, Respondent does not dispute the GBS diagnosis. Rule 4(c) Report at 6.

Mr. Hatch remained hospitalized through December 17, 2019. *See* Ex. 4 at 86. During this time, his treaters made additional notes relating to the onset of his symptoms. Mr. Hatch was seen by physiatrist Dr. Barry James Ross, who wrote that Mr. Hatch went to the hospital early on December 12, 2019 "after he noted progressively increasing difficulties with ambulation which likely began about 1 day earlier." *Id.* at 72. To Dr. Ross, Mr. Hatch again described his difficulties during the December 11, 2019 yoga session and stated that later that night, he was "quite off balance and was weaving as he walked down the hallway." *Id.* To a different doctor, he also mentioned that he had a cough for one month that had resolved two weeks prior, but did not describe any neurological concerns during this period. Ex. 20  at 298.

After a course of IVIG and physical and occupational therapy ("PT" and "OT"), Mr. Hatch's condition improved, but he was still experiencing numbness in his pelvis and lower extremities.[8] Ex. 20 at 1134. He was discharged to Cottage Health Rehabilitation Hospital, and then discharged from rehabilitation on December 24, 2019. Ex. 4 at 86, 112.

Mr. Hatch provided additional relevant information about onset during his rehabilitation admission. During his intake screening, he stated that he had "one day of difficulty walking followed by a fall during a yoga session on 12/11/2019."[9] Ex. 11 at 187. However, another doctor at this facility also wrote that on December 12, 2019, Mr. Hatch had "new onset" of bilateral upper and lower extremity weakness. *Id.* at 39. He reported that "that about a month and half ago he had a flu shot and then developed upper respiratory symptoms." *Id.* Further, at discharge, Mr. Hatch was noted to have been "in his usual state of health until he fell on 12/11 when he experienced the insidious onset of progressive lower extremity weakness and numbness." Ex. 20 at 1153. He thus "first experienced the symptoms on 12/11 while doing yoga," and "continued to worsen to the point that ambulation became difficult due to challenges with gait and balance."[10] *Id.*

---

[8] While hospitalized, Mr. Hatch developed right calf pain and was given prophylaxis for deep vein thrombosis. *Id.* at 73.

[9] It is not clear from the record if Mr. Hatch meant the day of difficult walking occurred on December 10, 2019, or if he had difficult walking on December 11, 2019, culminating in the fall during yoga. This distinction does not affect the viability of the Table claim, however.

[10] This physician also wrote that Mr. Hatch "did not describe any viral prodrome but did receive a flu shot several days prior." Ex. 20 at 1153. However, his vaccination indisputably occurred *77 days prior* to December 24, 2019.

**C.    Mr. Hatch Manages Residual GBS Sequelae for the Next Two Years and Reports an Earlier Onset for the First Time**

On January 21, 2020, Mr. Hatch saw Dr. Delio for a follow-up.[11] Ex. 8 at 8. He reported that he felt about "60% back to normal in terms of his overall motor function." *Id.* Mr. Hatch's mobility was improving with exercises, but he also was "walking more with a cane" and still had some "unusual sensation in his legs . . . ." *Id.* He also described problems with constipation. *Id.* In describing  medical history, Dr. Delio repeated portions of Mr. Hatch's hospital notes, including that he was in his usual state of health until December 11, 2019. *See id.* at 8-9. Dr. Delio felt that Mr. Hatch was making a good recovery overall. *Id.* at 8-9.

Mr. Hatch had another follow-up appointment with Dr. Delio on February 14, 2020. *Id.* at 12. He now indicated that his symptoms had regressed in the prior week, but that this had now resolved. *Id.* at 12-13. Dr. Delio noted that Mr. Hatch still had some lower extremity weakness and bowel issues.[12] *Id.* He underwent an electromyogram ("EMG") on February 21, 2020, which showed a "marked sensorimotor peripheral neuropathy that appeared to be mainly axonal rather than demyelinating." *Id.* at 15. It appears that Dr. Delio referred Mr. Hatch for further IVIG infusions, but he did not receive them due to the COVID-19 Pandemic and insurance denials. *See* Ex. 2 at 96-98; Ex. 24 at 8.

In October to December 2020, Mr. Hatch had five appointments with a pelvic floor physical therapist to address issues with bladder and bowel urgency and incontinence. Ex. 10 at 2-12. He also saw Dr. Kupperman and his primary care physician for follow-ups for other medical issues during this time period, into early 2021. *See* Ex. 2 at 87-89, 130-31; Ex. 4 at 122-26.

On May 7, 2021, Mr. Hatch resumed PT. Ex. 15 at 8. For the first time (and now almost a year and a half since his hospitalization), he informed the physical therapist that he had "[s]tarted noticing slight numbness in [left] arm and [bilateral lower extremities] in *November 2019*." *Id.* (emphasis added). These symptoms "significantly worsened" on December 11, 2019, prompting him to go to the hospital. *Id.* Mr. Hatch now felt that his condition had deteriorated and that he had less mobility than when he left the hospital. *Id.*

---

[11] After Mr. Hatch was discharged from Cottage Health Rehabilitation Hospital, he saw Dr. Kupperman and his cardiologist regarding his COPD and hypertension. *See* Ex. 3 at 5; Ex. 2 at 104. He also received regular monitoring of the brain aneurysms discovered during his hospital stay. *See* Ex. 9 at 8-12.

[12] Dr. Delio continued to believe that Mr. Hatch's symptoms were atypical for GBS, and noted a potential need to consider alternative diagnoses such as chronic inflammatory demyelinating polyneuropathy or sensory neuropathy. Ex. 8 at 14.

Mr. Hatch participated in 20 additional PT sessions through October 5, 2021. He experienced "[o]verall slight improvement with balance and strength," but continued to feel "very unsteady." *Id.* at 40. He was later discharged to a home exercise plan. *Id.* No other relevant medical records were filed.

### D.    Declaration Evidence

Mr. Hatch's longtime yoga instructor, Steve Dwelley, submitted a declaration dated June 23, 2022. Ex. 25 at 1-2. Mr. Dwelley stated that he remembered very well when Mr. Hatch fell during yoga in December 2019, because it was the last day that they practiced yoga together. *Id.* at 1. In the moment, Mr. Dwelley believed that the fall was a merely a "hiccup" that all people who practice yoga encounter. *Id.*

With regard to the onset of Mr. Hatch's GBS symptoms, Mr. Dwelley recalled that Mr. Hatch, "beginning in mid-October 2019, through November and up until his fall in December," had more yoga "hiccups" than usual, and required "lots of help with balance poses, which was unusual for him." Ex. 25 at 2. Mr. Dwelley further recalled Mr. Hatch reporting during this time that his "legs felt strange," but had presented the observation in "a somewhat humorous manner" by commenting that he felt that he was walking on air. *Id.* at 2.

Finally, Mr. Hatch submitted his own declaration, dated September 7, 2022. In it, he stated that nine or ten days after he received the flu vaccine, he felt it necessary to call Dr. Kupperman for a cough. *See* Ex. 24 at 3. He then wrote the following memo in his "personal medical folder":[13]

> Problem: Cough. Started 10/10 got worse. Peaked on 10/15. Couldn't sleep for coughing. Left arm and left leg felt 'funny' sort to [sic] numb and uncomfortable. Contacted Doctor. Got appointment for Chest Xray at Pueblo on 10/17. Want to rule out bad stuff: cancer, pneumonia, heart issues.

*Id.* Dr. Kupperman apparently told Mr. Hatch that "you cannot get flu from a flu shot" and treated him for the cough. *Id.*

Mr. Hatch explained that over the next seven weeks, he noticed some weakness and balance problems while practicing yoga, particularly in his left arm and legs, but "essentially ignored" it. Ex. 24 at 4. However, during the December 11, 2019 yoga

---

[13] Mr. Hatch did not explain the format of this "personal medical folder" and how he made entries in it. Mr. Hatch did not file any copies of a diary or other similar document.

session, his legs were "feeling funny" and he fell while attempting to stand up when his left leg collapsed under him. *Id.*

Mr. Hatch then described his admission to the hospital, with emphasis on the distress and fear that he experienced trying to find someone to care for his wife in his absence. *Id.* at 4-6. He stated that he has been left with nerve loss in his bowels and pelvic floor, which he found to be highly embarrassing and difficult to deal with. *Id.* at 7. He also still had a balance problem and walked with a cane or walking sticks. *Id.* 9. Overall, Mr. Hatch rated his condition as only about 50 percent better than when he left the hospital. *Id.* at 8.

## III.    Findings Regarding Onset For Table GBS Claim

### A.    Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A petitioner may prevail on his claim if he has "sustained, or endured the significant aggravation of any illness, disability, injury, or condition" set forth in the Table. Section 11(c)(1)(C)(i). If a petitioner establishes a Table injury, causation is presumed. If, however, the petitioner suffered an injury that either is not listed in the Table or did not occur within the prescribed time frame, the petitioner must prove that the administered vaccine caused his injury. Section 11(c)(1)(C)(ii) and (iii); *see Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1279-80 (Fed. Cir. 2005).

*Althen* requires that a petitioner

> to show by preponderant evidence that the vaccination brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Id.* All three prongs of *Althen* must be satisfied. *Id.*

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section

8

13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

However, the Federal Circuit "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). The Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

Further, medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

### B.   Petitioner Cannot Preponderantly Demonstrate Table Onset

A Table claim for GBS requires the "first symptom or manifestation of onset" to occur within "3 - 42 days (not less than 3 days and not more than 42 days)" after receipt of a seasonal flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). Here, the records from Mr. Hatch's in-patient treatment preponderantly establish that the first onset of his symptoms occurred on December 11, 2019, or *64 days after vaccination*. This is well beyond the timeframe set forth in the Table.

Petitioner attempts to identify an onset that falls within the Table timeframe, but her contentions are not supported by the record. Petitioner strives to reframe December 11, 2019, as the point of "acute escalation" of symptoms that had begun earlier. Br. at 17.

But none of the contemporaneous records from Mr. Hatch's hospitalization or rehabilitation admission at all suggest that his falls on December 11, 2019 reflected the culmination of "progressively increasing difficulties," as now claimed. *See id.* Petitioner does not identify any record from Mr. Hatch's in-patient treatment in which he even hinted at having symptoms in October or November 2019. At best, he indicated that he may have experienced "one day of difficult walking" before the December 11, 2019 yoga session. *See* Ex. 11 at 187. And treaters also repeatedly and definitively described December 11, 2019 as the onset of Mr. Hatch's symptoms. Br. at 17.

Petitioner's argument that when describing his condition during his hospitalization, Mr. Hatch omitted that he had been experiencing weakness in October/November 2019 because he did not recognize the seriousness of his condition or the relevance of these alleged prior symptoms, is also belied by the contemporaneous record (and more specifically the circumstances in which Mr. Hatch's GBS arose). *See id.* Mr. Hatch was a detailed historian, and was extremely precise in pinpointing when his symptoms began. He did not just mention December 11, 2019 in passing, but explained that he *first* noticed a balance problem on that date to multiple treaters. Given his demonstrated anxiety about being unable to care for his wife while being medically treated, it is highly likely that he would have provided a detailed history at the time of these acutely-realized symptoms. I therefore give significant weight to the hospital records that establish onset as December 11, 2019.

The sole medical record entry supporting Petitioner's onset timeline is found in a May 7, 2021 PT note, but it does not warrant significant weight. This record was not made contemporaneously with in-patient treatment, and is flatly inconsistent with earlier onset accounts. Petitioner has not provided an explanation for why it took Mr. Hatch over a year and a half to report that he actually experienced numbness/weakness in November 2019. Notably, he had follow-up appointments with Dr. Delio in early 2020 and underwent an EMG, but did not mention this new information.

The declaration evidence is also not sufficiently consistent, clear, cogent, and compelling to outweigh the contemporaneous medical records. Mr. Hatch purports in witness statements that his symptoms began nine or ten days after vaccination, when he allegedly called Dr. Kupperman about his cough and noted in his "personal medical folder" that his left arm and left leg felt "funny" and "numb and uncomfortable." Ex. 24 at 3. However, although Mr. Hatch quoted from a "personal medical folder" entry, Petitioner did not file a copy or even explain its format.[14] Further, when Mr. Hatch received the chest

---

[14] Mr. Dwelley's declaration is also vague and inconsistent. Mr. Dwelley asserted that he assumed the December 11, 2019 fall was an unremarkable "hiccup" that everyone who practices yoga encounters, but also was able to recall years later that Mr. Hatch had been experiencing an unusual amount of these "hiccups" in October/November 2019. *See* Ex. 25 at 1-2.

x-ray and then saw Dr. Kupperman on October 18, 2019, he was only treated for pulmonary issues. *See* Ex. 17 at 17; Ex. 2 at 110. In fact, he appears to have at this time denied any new neurological concerns, despite his history of tremor and Bell's palsy. His retrospective assessment that his legs felt strange prior to December 11, 2019, does not outweigh the clear information about onset that he provided to his treaters at the hospital for the purpose of receiving medical care.

Petitioner's final argument is to apply statistics about the typical clinical course of GBS to attempt to prove that the onset of Mr. Hatch's own symptoms must have been before December 11, 2019. *See* Pet'r Br. at 19-22. Petitioner cites certain studies finding that the nadir of symptoms occurs within two weeks for 50 percent of patients and within four weeks for 90 percent of patients, or that the mean time of nadir is approximately ten days. *See id.* at 19-20. Petitioner concludes that it would thus be "exceedingly unlikely" that Mr. Hatch experienced a more rapid onset. *Id.* at 20. According to Petitioner, the data "dictates" that his onset occurred between ten days and four weeks prior to December 11, 2019. *Id.*

This argument, however, works backwards from a faulty starting point. There is no basis for Petitioner's assumption that December 11, 2019 was the nadir of Mr. Hatch's symptoms. In order to properly characterize a date as the nadir, there must also have been gradually worsening symptoms before that point. However, as explained above, the most persuasive and contemporaneous evidence does not support the premise that Mr. Hatch experienced any GBS symptoms in October or November 2019. Regardless of statistical probability or the nature of a typical GBS case, I cannot find in favor of a claimant without sufficiently probative record evidence in his favor. *See Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1363 (Fed. Cir. 2019).[15]

Further, this argument does not even assist Petitioner in establishing a Table claim. Even if I accepted that Mr. Hatch's symptoms reached nadir on December 11, 2019, an onset of two weeks *prior to that date* (or late November 2019) would still be outside the maximum 42 days set forth in the Table. As Respondent notes, I would need to find specifically that onset occurred sometime between November 13, 2019 (four weeks prior to December 11, 2019) and November 19, 2019 (42 days post-vaccination) for Petitioner to have a valid Table claim.[16] *See* Opp. at 7 n.5. Mr. Hatch's reference at

---

[15] It should also be noted that (as recognized by the Table) GBS progresses from onset to nadir usually within 12 hours to 28 days – and thus an October onset should have led to nadir by the end of November, and not almost two weeks later. 42 C.F.R. § 100.3(c)(15)(i).

[16] Similarly, Petitioner attempts to argue that Mr. Hatch's elevated CSF protein levels on December 12, 2019 demonstrate that onset must have occurred at least one to two weeks earlier. *See* Pet'r Br. at 21. Petitioner cites studies finding that only a minority of patients had elevated levels at the first day of symptoms, but up to 88 percent had it after two weeks. Again, an onset two weeks prior to December 11,

the May 7, 2021 PT appointment to symptoms in "November 2019" more generally does not come close to preponderant evidence on this point. *See* Ex. 15 at 8.

Fundamentally, Petitioner's arguments suffer from internal inconsistency. The theory propounded in Petitioner's brief (that onset occurred between ten days and four weeks prior to December 11, 2019) does not align with Mr. Hatch's testimony. In his declaration, Mr. Hatch instead suggested that the onset of his symptoms was mid-October 2019. Ex. 24 at 3. Mr. Dwelley's declaration also appeared to follow the idea of a mid-October 2019 onset as well. *See* Ex. 25 at 1-2. Even more, a mid-October 2019 onset would itself be inconsistent with Mr. Hatch's report to his physical therapist of symptoms beginning in November 2019. These issues underscore the lack of evidence supporting the Table claim.

Overall, then, the record in this case does not support a finding of Table-consistent onset for flu vaccine-caused GBS – and therefore no Table claim is viable.

## IV.   Petitioner Shall Show Cause Why a Causation-in-Fact Claim Should Not Be Dismissed

The Petition did not expressly plead either a Table claim or a causation-in-fact claim, but simply alleged that Mr. Hatch suffered GBS as "the result of the flu vaccination that he received on October 8, 2019." Petition at ¶¶ 2-3. To the extent Petitioner intended to make a causation-in-fact claim in the alternative, the third *Althen* prong requires a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008).

As explained above, preponderant evidence establishes that Mr. Hatch's initial symptoms did not occur until December 11, 2019 -- 64 days, or nine weeks and one day -- post-vaccination.[17] However, in most successful non-Table cases involving flu vaccine-caused GBS, onset of symptoms is demonstrated to have occurred no longer than *six to eight weeks* after vaccination. *See,* e.g., *Barone v. Sec'y of Health & Hum. Servs.*, No. 11-707V, 2014 WL 6834557, at *13 (Fed. Cl. Spec. Mstr. Nov. 12, 2014). Some special masters may have accepted timeframes slightly longer than eight weeks, but I am not bound by those determinations and they do not control the outcome here. *See,* e.g.,

---

2019 would still fall outside of the 42-day Table window.

[17] If Petitioner's reference to "one day of difficulty walking followed by a fall during a yoga session on 12/11/2019" is taken to mean December 10, 2019, then onset would have occurred 63 days post-vaccination. *See* Ex. 11 at 187.

*Spayde v. Sec'y of Health & Hum. Servs.*, No. 16-1499V, 2021 WL 686682, at \*19 (Fed. Cl. Spec. Mstr. Jan. 27, 2021) (60 days). And even when considering these outliers, I am "not aware any case in which a special master recognized an onset of longer than 60 days post-vaccination." *See Kindle v. Sec'y of Health & Hum. Servs.*, 177 Fed. Cl. 689, 713 n.23 (2025). The timeframe at issue, therefore, is notably long – and would likely be deemed too long even if a very low bar is set for proving the third *Althen* prong.

In making this observation, I am in no way suggesting that inflexible "hard and fast deadline[s]" exist for causation claims that can be applied across the board – and where not met should automatically result in a denial of entitlement. *See Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1383 (Fed. Cir. 2015). However, in "failed" Table cases it is a petitioner's burden to prove, by a preponderance of the evidence, that his GBS developed within a medically-acceptable timeframe after receipt of a flu vaccine. In looking to what evidence Petitioner could muster here, the medical science *does not support* an antibody-driven autoimmune cross-reaction resulting in demyelination occurring in such a lengthy post-vaccination timeframe. It is *highly* unlikely that vaccine-caused GBS will occur nine weeks post-vaccination.

Petitioners with protracted onsets generally point to the Schonberger study, which compared the incidence of GBS in adults in the United States who received the 1976-1977 swine influenza vaccine with the incidence of GBS in unvaccinated adults. *See* Lawrence B. Schonberger *et al.*, *Guillain Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976-1977*, 110 Am. J. Epidemiology 105-23 (1979) ("Schonberger"). The authors of Schonberger stated that the period of increased risk of contracting GBS was concentrated primarily within the five-week period after vaccination, but lasted for approximately nine or ten weeks. *See id.* at 105. However, simply because the authors observed a statistically significant increase in reported cases as far out as nine to ten weeks post-vaccination (.42 cases in week nine, and .40 cases in week ten), *see id.* at 113, does not mean that it is equally likely for GBS to first manifest at this time as it is much earlier. Schonberger cannot be used to conflate the onset of GBS symptoms at any time up to ten weeks post-vaccination with medical acceptance that the flu vaccine caused the most extended cases.

I also cannot ignore the medical science relied upon by the Government in creating the flu vaccine-GBS Table claim elements. *See Beckwith v. Sec'y of Health & Hum. Servs.*, No. 21-1660V, 2025 WL 2815711, at \*16 (Fed. Cl. Spec. Mstr. Aug. 29, 2025), *mot. for review den'd*, 180 Fed. Cl. 368 (2026). As I stated in *Beckwith*, in discussing an onset of less than three days, the "medical/scientific foundation (which led the Government to presume causation when certain facts are proven) remains meaningful, and should still be taken into account to some degree when deciding claims that 'fall out'

of the Table." *Id.*[18] Therefore, "[t]he Table timeframe of three to 42 days best captures the most likely period in which flu vaccine-caused GBS would begin, based on the most persuasive and reliable science available when the terms of the Table claim were struck." *Id.* (citing *Rowan v. Sec'y of Health & Hum. Servs.*, No. 17-760V, 2020 WL 2954954, at *14-16 (Fed. Cl. Spec. Mstr. Apr. 28, 2020) (discussing the relationship between Table requirements and non-Table claims in context of flu GBS claims)). In addition, it is important to emphasize that this timeframe is also already engineered to be *overinclusive*, given that the greatest likelihood of onset occurs within two to three weeks, decreasing thereafter towards the 42nd day. The "true" risk of vaccine-caused GBS is not equal throughout the period.

At bottom, it is Petitioner's burden to prove *more likely than not* that Mr. Hatch's GBS onset occurred in a medically acceptable timeframe. *Rowan,* 2020 WL 2954954, at *17-*18. A temporal association by itself is not sufficient. And as the Federal Circuit has held, proof of a "plausible" or a "possible" causal link between the vaccine and the injury is not the standard. *See Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010); *see also Veryzer v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 344, 356 (2011) *aff'd per curiam*, 475 F. App'x 765 (Fed. Cir. 2012). Further, if onset occurred too late in time post-vaccination to be medically acceptable, a claimant's ability to meet the second *Althen* prong is also implicated.

Accordingly, in responding to this Order, Petitioner should not expect that merely retaining an expert willing to call a 64-day post-vaccination onset "medically acceptable" (and with a brief nod in Schonberger's direction) is enough to end the inquiry. Rather, and as I stated in *Beckwith* (another failed Table flu vaccine-GBS case), when onset does not fit the Table timeframe the claimant needs to "establish (via evidence) what about the specific facts of their medical history or personal circumstances" made such a fast (or slow) onset likely. *Beckwith,* 2025 WL 2815711, at *17. I will evaluate whether Petitioner has established a medically acceptable timeframe from which to infer causation "based on the circumstances of the particular case." *Beckwith,* 180 Fed. Cl. at 380 (citing *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994)).

---

[18] I have also noted (in the context of other matters where a Table claim was found not to be viable due to an inability to meet an onset requirement, resulting in analysis of the claim under the *Althen* prongs) that claimants cannot "'piggyback' on the Table timeframes for appropriate onset." *Greene v. Sec'y of Health & Hum. Servs.*, No. 11-631V, 2019 WL 4072110 (Fed. Cl. Spec. Mstr. Aug. 2, 2019), at *2, *mot. for review den'd*, 146 Fed. Cl. 655 (2020), *aff'd*, 841 F. App'x 195 (Fed. Cir. 2020); *see also Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1147-48 (Fed. Cir. 1992) ("[s]imple similarity to conditions or time periods listed in the Table is not sufficient evidence of causation")). The fact that an actual onset falls only "a little bit" outside the defined Table period does not mean the established timeframe should simply be read as acceptable, merely because it was somewhat close. This is the reverse of a "bright line" approach, but no less unreasonable, to the extent it measures onset acceptability by how nearly it misses the Table timeframe endpoint.

That kind of showing is not easy to make. In *Kindle v. Sec'y of Health & Hum. Servs.*, No. 20-1423V, 2025 WL 603690 (Fed. Cl. Spec. Mstr. Jan. 21, 2025), *mot. for rev. den'd*, 177 Fed. Cl. 689 (2025), I concluded that a petitioner had not "persuasively established circumstances in which such an unusually lengthy post-vaccination onset could still be deemed medically acceptable," especially because the petitioner's earlier symptoms were either unrelated to his GBS, or reflected pre-vaccination conditions. *Id.* at *8. The petitioner thus "failed to prove that his particular case deviated from the typical presentation of GBS." *Kindle*, 177 Fed. Cl. at 715. Where a long (or short) timeframe from vaccination to onset of GBS is at issue, the petitioner's unique medical circumstances matter.

Although the Vaccine Act "is a pro-claimant regime meant to allow injured individuals a fair and fast path to compensation," *K. G. v. Sec'y of Health & Hum. Servs.*, 951 F.3d 1374, 1380 (Fed. Cir. 2020), it is not the case that all post-vaccination injury is compensable. *See Bulman v. Sec'y of Health & Hum. Servs.*, No. 19-1217V, 2023 WL 5844348, at *14 (Fed. Cl. Aug. 16, 2023) ("Program case law recognizes that not all post-vaccination injuries are vaccine-caused simply because vaccination predated them"). The dividing line is what a petitioner can establish as a medically acceptable timeframe to infer causation. *de Bazan*, 539 F.3d at 1352. It simply becomes unlikely that a long onset reflects a case of GBS caused by vaccination. And unless Petitioner can marshal more recent medical or scientific literature on the topic, it is unlikely that she can show otherwise.

### Conclusion

**Petitioner's Table claim is dismissed. Petitioner is ORDERED to Show Cause why the causation-in-fact claim should not also be dismissed. Petitioner shall comply with this order <u>by June 23, 2026</u>.[19] (Petitioner may consult with an expert, but should not at this time file an expert report). Respondent may file a response within <u>30 days thereafter</u> and Petitioner may file any reply <u>within 15 days after that</u>.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[19] Alternatively, if Petitioner wishes to exit the Vaccine Program, counsel shall file the appropriate motion, Stipulation, or Notice. *See* https://www.uscfc.uscourts.gov/sites/default/files/Guidance%20on%20Exiting%20the%20Vaccine%20Program.pdf.